IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>LTC HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 7<br><br>Case No. 14-11111 (CSS)<br>(Jointly Administered)<br><br>Hearing Date: September 5, 2014 at 3:00 p.m.<br>Obj. Deadline: August 29, 2014 at 4:00 p.m. |

**CHAPTER 7 TRUSTEE'S MOTION FOR AUTHORITY TO OPERATE THE
DEBTORS' BUSINESS FOR A LIMITED TIME PURSUANT TO 11 U.S.C. § 721**

Alfred T. Giuliano (the "Trustee"), the chapter 7 trustee for the jointly administered estates of LTC Holdings, Inc., *et al.* (the "Debtors"), respectfully requests the entry of an order for authority to operate the Debtors' business for a limited period through and including December 5, 2014, pursuant to 11 U.S.C. § 721 (the "Motion"). In support of the Motion, the Trustee respectfully states as follows:

**JURISDICTION**

1. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2. Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief sought herein is section 721 of title 11 of the United States Code (the "Bankruptcy Code").

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers are (i) LTC Holdings, Inc. (3283) (Case No. 14-11111); (ii) LTCCORP, Inc. (1361) (Case No. 14-11112); (iii) LTCCORP Government Services, Inc. a/k/a Lakeshore Toltest Corporation; LTC (2894) (Case No. 14-11113); (iv) LTCCORP Government Services-MI, Inc. a/k/a Lakeshore Engineering Services, Inc.; Lakeshore Group; LTC Corp Michigan; LTC Michigan (8977) (Case No. 14-11115); (v) LTCCORP Government Services-OH, Inc. a/k/a TolTest, Inc.; LTC; LTC Ohio; LTC Corp; LTC Corp Ohio (1985) (Case No. 14-11116); and (vi) LTCCORP E&C Inc. (6406) (Case No. 14-11117).

## BACKGROUND

4. On May 2, 2104 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code.

5. On or about May 2, 2014, the Office of the United States Trustee appointed the Trustee as chapter 7 trustee, which appointment remains in effect.

6. By Order entered on May 14, 2014, this Court consolidated the Debtors' cases, for procedural purposes only, and ordered the joint administration of the Debtors' cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1 (the "Joint Administration Order"). [D.I. 17].

7. Prior to the Petition Date, the Debtors entered into numerous contracts and task orders (the "Contracts") with various agencies of the United States, municipal government agencies, the United States Department of Defense (collectively, the "Government"), commercial clients, and oil and gas clients, to provide certain goods and services including, but not limited to, the following:

   a. construction services, including construction management, military contracting, infrastructure construction, airfield construction, electrical construction, marine construction, historical renovation, demolition/deconstruction, and sustainability;

   b. environmental services, including remediation and restoration, compliance, waste management, decontamination, demolition, decommissioning, and green demolition; and

   c. energy services, including projects to conserve electricity, promote recycling, store bulk fuels, and support gas and oil field exploration and delivery.

(the "Projects").

8. As set forth in more detail below, the Trustee seeks authority pursuant to 11 U.S.C. § 721 to operate the Debtors' business for a limited period through and including

December 5, 2014, and to engage Custom Mechanical Systems, Corp. ("CMS") as his consultants, subject to Court approval, to (a) identify and liquidate/sell (the "Foreign Sales") various assets of the Debtors, including but not limited to, the Debtors' vehicles located in countries outside of the United States of America (the "Foreign Vehicles"), and the Debtors' fixtures, furniture, machinery, and equipment located in countries outside of the United States of America (the "Foreign FF&E" and collectively with the Foreign Vehicles, the "Foreign Property" or "Foreign Assets"); (b) identify and assist the Trustee in liquidating and selling (the "Domestic Sales") various assets of the Debtors, including but not limited to, the Debtors' vehicles located in the United States of America (the "Domestic Vehicles"), and the Debtors' fixtures, furniture, machinery, and equipment located in the United States of America (the "Domestic FF&E" and collectively with the Domestic Vehicles, the "Domestic Property"); (c) assist the Trustee in selling that certain real property located at 5826 Baldwin Lane, Williston, ND 58801 (the "Real Property")[2]; (d) assist the Trustee in the recovery of monetary awards from potential insurance recoveries from policies, Litigation Actions and Avoidance Actions, requests for equitable adjustments, amounts owed, appeals, and/or arbitrations involving any of the Debtors and in the collection of the Unpaid Contract Funds, and as requested by the Trustee, assist in connection with the Weatherford Action (as defined below) and any and all federal and state claims for tax refunds, including but not limited to, the Tax Refund (as defined below) (collectively, the "Accounts Receivable")[3]; (e) assist the Trustee in closing the Debtors' books

---

[2] The Real Property consists of a five (5) acre parcel of land with a 6,200 square foot industrial steel frame metal facility.

[3] CMS is not entitled to receive any compensation in connection with any arbitration award or settlement from the Weatherford Action, or in connection with any and all federal and state claims for tax refunds, including but not limited to the Tax Refund. As such, for purposes of this Motion, the definition of Accounts Receivable does not include any arbitration award or settlement from the Weatherford Action, or in connection with any and all federal and state claims for tax refunds, including but not limited to the Tax Refund. In addition, in order to avoid any

and records as of the Petition Date; and (f) provide accounting information and documentation on the Contracts and Projects to surety companies that issued performance and payment bonds in connection with the aforementioned Contracts and Projects, and to other third parties. In support of this Motion, the Trustee submits the Affidavit of Ernest C. Enrique, PE (the "Enrique Affidavit"), which is attached hereto as **Exhibit "A"** and incorporated by reference herein.[4]

9.   CMS is not entitled to receive any compensation in connection with any arbitration award or settlement from the Weatherford Action, or in connection with any and all federal and state claims for tax refunds, including but not limited to the Tax Refund.

10.   CMS is a prime construction contractor that provides certain goods and construction services, including construction management, military contracting, infrastructure construction, to the Government and its commercial clients. Certain employees and executives of CMS were former employees of the Debtors, including but not limited to, the Debtors' former risk management specialist, procurement manager, general counsel, IT specialists, accounts receivable supervisor, among others. These employees and executives of CMS have unique and special knowledge of the Debtors' Contracts, the Projects, the location of the Foreign Assets, the Unpaid Contract Funds (as defined below) due and owing to the Debtors for their services performed on the Projects under the Contracts, the factual basis and grounds for establishing the Weatherford Claim, the causes of action asserted in the Litigation Actions (as defined below), and the Debtors' books and records. Without the unique knowledge and assistance of CMS, the Trustee would not be able to maximize the value of the Debtors' assets for the Estates.

---

doubt, other than amounts due to CMS under paragraph 27, CMS is not entitled to any additional compensation (other than its contingency fee in Litigation Actions, as that term is defined below) for any litigation support.

[4] To be produced at the request of the Office of the United States Trustee, the Trustee will submit prior to the hearing on the Motion, an Affidavit of Joseph R. Ballmer, an independent contractor of CMS, which will be incorporated as an exhibit to this Supplement.

11. If the Trustee were granted the authority pursuant to 11 U.S.C. § 721 to operate the Debtors' business for a limited time and to engage CMS, the Trustee would have the greatest potential to maximize the value of the Debtors' assets, which are significant.

12. Significant assets of the Debtors include the Debtors' rights in an arbitration action that the Debtors commenced prior to the Petition Date before the London Court of International Arbitration, captioned as *LTC v. Weatherford Oil Tool Middle East, Ltd.* (the "Weatherford Action"). If the Debtors were successful, the Weatherford Action would generate proceeds in excess of $46,000,000.00.

13. Additionally, the Debtors' assets include their $5,000,000 federal tax refund request filed with the Internal Revenue Service (the "Tax Refund"). The Tax Refund is currently under an audit and is pending before the Internal Revenue Service's Joint Committee on Taxation.

14. Also, the Debtors' Estates are owed a significant amount of unpaid funds from their customers on account of pre-petition services that were performed on the Projects which the Debtors had not invoiced and/or received full payment on all submitted invoices (the "Unpaid Contract Funds"). The amount of Unpaid Contract Funds due and owing to the Estates is in excess of $10,000,000.

15. The Debtors' Estates are also owed a significant amount of Accounts Receivable. The estimated value of the Accounts Receivable due and owing to the Estates is approximately $28,082,004.

16. Moreover, the Debtors were parties to and/or parties-of-interest in certain litigation, including, but not limited to: (a) appeal proceedings before the Armed Services Board of Contract Appeals (the "ASBCA"), ASBCA Nos. 58880, 58954, 59069, 59070, 59071, 59141,

59195, 59249, and 59267 against the Government to recover amounts due and owing under certain contracts with the Government (the "ASBCA Appeals"); (b) breach of contract actions against the Government pending before the United States Court of Federal Claims (the "Government Actions"); and (c) breach of contract disputes and actions against non-government third-parties (the "Third-Party Actions" and collectively with the ASBCA Appeals and the Government Actions, the "Litigation Actions").[5] The value of the Litigation Actions are well in excess of $30,000,000.

17. Also, with respect to the Foreign Property and the Domestic Property (i) the estimated value of the Foreign Vehicles and the Domestic Vehicles is $1,061,479; and (ii) the estimated value of the Foreign FF&E and the Domestic FF&E is approximately $4,198,590. The Trustee needs the assistance of CMS in identifying and locating the Foreign Property and Domestic Property. Specifically, a significant amount of the Foreign Property is located in hostile foreign countries, such as Iraq, and Afghanistan. Without the assistance of CMS, the Trustee would not be able to locate most of the Foreign Property, let alone locate any buyer in these foreign countries for any of the Foreign Property, which includes commercial size manufacturing and construction equipment. Because CMS and its employees have knowledge pertaining to the location of a substantial amount of the Foreign Property, the values that could be extracted, and relationships with third-parties located in those regions to identify/sell the Foreign Property, the assistance of CMS is critical. In addition, CMS has unique knowledge of the locations, types, and values of the Domestic Property, which is instrumental to assisting the Trustee in securing the highest prices from the Domestic Sales of the Domestic Property. An

---

[5] The defined term "Litigation Actions" does not include the Weatherford Action or any action relating to the recovery of any and all federal or state claims tax refunds.

auctioneer would not be privy to this information pertaining to the Domestic Property, and as such, the potential value of the Debtors' Domestic Property to the Estates would decrease.

18.     Lastly, the Debtors' assets include the Real Property. The estimated value of the Real Property is $1,200,000.

19.     Since the Petition Date and the Trustee's appointment, the Trustee has been analyzing the BMO Collateral[6] and the BMO Claim, the Weatherford Action, the Unpaid Contract Funds, the Tax Refund, the Litigation Actions, the Foreign Property, and the Domestic FF&E, and the alternatives to liquidate these assets.

20.     The Trustee has determined in conjunction with his professionals and advisors, that at this time the greatest potential to maximize the value of the Debtors' assets is to operate the Debtors' assets as a going concern and engage the assistance of CMS and its employees with

---

[6] Prior to the Petition Date, on May 29, 2013, Debtor LTCCORP Government Services, Inc., Debtor LTC Holdings, Debtor LTCCORP Government Services-MI, and Debtor LTCCORP Government Services-OH, Inc., made, executed and delivered to BMO that certain Security Agreement (the "Security Agreement"). In connection therewith, BMO filed certain U.C.C. Financing Statements, thereby perfecting its first priority lien upon and security interest in substantially all of the Debtors' personal property, with the exception of the Excluded Assets[6] (as defined in the Memorandum of Understanding) and potentially the Foreign Assets[6] (the "BMO Collateral"). As of the Petition Date, the balance outstanding under the Credit Agreement was no less than $39,153,909.92 (the "BMO Claim").

On July 2, 2014, the Trustee entered into that certain Memorandum of Understanding with BMO in order to set forth the Trustee and BMO's mutual understanding regarding BMO's liens and security interests in the BMO Collateral, and the Trustee's liquidation of the BMO Collateral and the carve-out for the benefit of the Estates in connection with the liquidation of the BMO Collateral.

The BMO Collateral covers substantially all of the Debtors' personal property, including but not limited to, the Weatherford Action, the Tax Refund, the Unpaid Contract Funds, the Litigation Actions, the Accounts Receivable, and substantially all of the Domestic FF&E Property.

The BMO Collateral does not include the Debtors' interest in certain real and personal property, including (a) certain real property located at 5826 Baldwin Lane, Williston, ND 58801 (the "Real Property"); (b) certain titled vehicles located in the United States of America; (c) equity interests owned by the Debtors (except those which have been pledged to BMO and as to which BMO has possession of stock certificates and/or certificated membership interests); (d) any claims, litigation rights, or causes of action pursuant to sections 544, 545, 547, 548, and 550 of the Bankruptcy Code (except to the extent that claims, litigation rights, or causes of action asserted under chapter 5 of the Bankruptcy Code call for recovery of BMO Collateral)[collectively, the "Avoidance Actions"]; and (e) tort claims." Memorandum of Understanding at 2. Additionally, the BMO Collateral potentially does not include the Foreign Property.

respect to the Debtors' business, locating the Debtors' assets, and liquidation alternatives. In order to maximize the value of the Debtors' assets, the Trustee seeks to engage the assistance of CMS to (a) identify, liquidate and conduct Foreign Sales of the Foreign Property; (b) assist in the Domestic Sales of the Domestic Property; (c) assist in the sale of the Real Property (d) assist in the recovery of the Accounts Receivable; (e) assist the Trustee in closing the Debtors' books and records as of the Petition Date; and (f) provide accounting information and documentation on the Contracts and Projects to surety companies that issued performance and payment bonds in connection with the aforementioned Contracts and Projects, and to other third parties.

## RELIEF REQUESTED

21.     By and through this Motion, the Trustee seeks authority pursuant to 11 U.S.C. § 721 to (i) operate the Debtors' business for a limited period through and including December 5, 2014, without prejudice to the Trustee's right to seek additional time to operate the Debtors' business pursuant to 11 U.S.C. § 721; and (ii) engage the assistance of CMS as his consultants, in order to maximize the greatest potential of the value of the Debtors' assets.

22.     In connection with implementing this strategy, the Trustee seeks to engage CMS and its employees as his consultants because of (a) its knowledge of the Debtors' Contracts and Projects; and (b) its knowledge of the location and value of the Foreign Property and the Domestic Property. The Trustee believes that CMS has no disqualifying conflicts of interest. CMS has advised the Trustee that it may have previously represented, may currently represent, and may in the future represent, certain entities that are claimants or potential claimants of the Debtors, or other parties in interest, in matters wholly unrelated to these chapter 7 cases and their respective claims or potential claims against the Debtors. CMS has not – except as otherwise disclosed in the Enrique Affidavit – and will not represent any such party, or any of their

affiliates or subsidiaries, in relation to the Trustee, the Debtors, or these cases. The Trustee believes CMS is qualified to assist the Trustee in these chapter 7 cases.

A. **Compensation of CMS**

23. The services CMS may be required to render for the Trustee are limited to the following:

    a. Identifying Foreign Property located in countries outside of the United States;

    b. Conducting the Foreign Sales of the Debtors' Foreign Property;

    c. Identifying the Domestic Property located in the United States;

    d. Assisting in the Domestic Sales of the Debtors' Domestic Property;

    e. Assisting in the sale of the Real Property;

    f. Assisting in the recovery and collection of Accounts Receivable, which includes the following:

        i. In connection with services that CMS renders for requests for adjustments of monies due and owing to the Debtors based on additional goods and services that the Debtors provided on certain Projects for the Government pursuant to change orders issued by the Government that required additional goods and services over and above the contracted amounts (the "Equitable Adjustments" or the "EAS"), CMS' services may include the following:

            1. Analysis of the value of the additional goods and services that the Debtors were required to perform pursuant to the change order issued by the Government, any delays in the completion of certain Projects, and the impact of the change orders on any delay damages claimed by the Government;

            2. Analysis of overlay between any delays caused by the Debtors and any delays caused by counter-parties to the Contracts for the Projects, the impact these concurrent delays had on the completion date of a Project, and an allocation of each party's delay and expense;

9

    3. Providing background information for purposes of reattributing and reallocating liquidated damages under the Contracts due to the change orders;

    4. Analysis of mitigation impact on Government caused delays;

    5. Analysis of impact and valuation for recovery due to differing site conditions; and

    6. Review bid documents for Contracts and evaluation of the terms in the Contracts.

  ii. In connection with services that CMS renders in connection with litigation, those services may include the following:

    1. Assisting in the production of documents;

    2. Assisting in responding to discovery requests;

    3. Providing factual background support for the prosecution of claims;

    4. Assisting in litigation support; and

    5. Assisting in the preparation of witnesses.

  iii. In connection with services that CMS renders in connection with other matters pertaining to the recovery and collection of Accounts Receivable, those services may include the following:

    1. Providing internal support;

    2. Providing information and documentation in support of discovery;

    3. Assisting in the production of documents; and

    4. Providing information and documentation for the evaluation of claims.

g. Assisting the Trustee in closing the Debtors' books and records as of the Petition Date; and

h. Providing accounting information and documentation on the Contracts and the Projects, to surety companies and to other third parties.

24. In connection with services that CMS renders for the Foreign Sales of the Debtors' Foreign Property, the Trustee requests that CMS be compensated on a commission basis from the net proceeds of the Foreign Sales of the Foreign Property (net of costs and expenses incurred in connection with the Foreign Sales of the Foreign Property), plus the reimbursement of the actual and necessary expenses that CMS incurs, as follows: (a) a commission equal to twenty-five percent (25%) of the net proceeds received from the Foreign Sales of the Foreign Property (net of costs and expenses incurred in connection with the Foreign Sales of the Foreign Property) (the "Foreign Commission"); and (b) the reimbursement of any out-of-pocket costs and expenses incurred by CMS in connection with the Foreign Sales of the Foreign Property (the "Foreign Expenses"). The total of the Foreign Commission and Foreign Expenses shall not exceed thirty-three (33%) percent of the net proceeds received from the Foreign Sales of the Foreign Property (net of costs and expenses incurred in connection with the Foreign Sales of the Foreign Property).

25. In connection with services that CMS renders to assist in the Domestic Sales of the Debtors' Domestic Property, the Trustee requests that CMS be compensated on a commission basis from the net proceeds of the Domestic Sales of the Domestic Property (net of *other* costs and expenses incurred in connection with the Domestic Sales of the Domestic Property, *including any auctioneer's commission*), plus the reimbursement of the actual and necessary expenses that CMS incurs, as follows: (a) a commission equal to twenty-five percent (25%) of the net proceeds received from the Domestic Sales of the Domestic Property (net of *other* costs and expenses incurred in connection with the Domestic Sales of the Domestic Property, *including any auctioneer's commission*) (the "Domestic Commission"); and (b) the reimbursement of any out-of-pocket costs and expenses incurred by CMS in connection with the

Domestic Sales of the Domestic Property (the "Domestic Expenses"). The total of the Domestic Commission and Domestic Expenses shall not exceed thirty-three (33%) percent of the net proceeds received from the Domestic Sales of the Domestic Property (net of *other* costs and expenses incurred in connection with the Domestic Sales of the Domestic Property, *including any auctioneer's commission*). CMS' unique knowledge of the locations, types, and values of the Domestic Property is instrumental to assisting the Trustee in securing the highest prices from the Domestic Sales of the Domestic Property. An auctioneer would not be privy to this information pertaining to the Domestic Property, and as such, the potential value of the Debtors' Domestic Property to the Estates would decrease.

26. In connection with services that CMS renders in connection with the sale of the Real Property, the Trustee requests that CMS be compensated on a commission basis from the net proceeds of the sale of the Real Property (net of *other* costs and expenses incurred in connection with the sale of the Real Property, *including any real estate broker's commission*), plus the reimbursement of the actual and necessary expenses that CMS incurs, as follows: (a) a commission equal to fifteen percent (15%) of the net proceeds received from the sales of the Real Property (net of *other* costs and expenses incurred in connection with the sale of the Real Property, *including any real estate broker's commission*) (the "Real Property Commission"); and (b) the reimbursement of any out-of-pocket costs and expenses incurred by CMS in connection with the sale of the Real Property (the "Real Property Expenses").

27. In connection with services that CMS renders in connection with the recovery and collection of Accounts Receivable and with services that CMS renders in assisting the Trustee in the Litigation Actions, the Trustee requests that CMS be compensated on a commission basis from the gross proceeds recovered on account of the Accounts Receivable and the Litigation

Actions, as follows: (i) a commission equal to ten percent (10%) of the gross proceeds recovered on account of the Accounts Receivable; and (ii) a commission equal to ten percent (10%) of the gross proceeds recovered on account of a Litigation Action. The proposed compensation to CMS in connection with services that it renders in connection with the recovery and collection of Accounts Receivable excludes any compensation in connection with any arbitration award or settlement from the Weatherford Action, or in connection with any and all federal and state claims for tax refunds, including but not limited to the Tax Refund. CMS is not entitled to receive any compensation, commission basis or otherwise, in connection with any arbitration award or settlement from the Weatherford Action, or in connection with any and all federal and state claims for tax refunds, including but not limited to the Tax Refund.

## BASIS FOR RELIEF REQUESTED

28. Section 721 of the Bankruptcy Code provides that "[t]he court may authorize the trustee to operate the business of the debtor for a limited period, if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate." 11 U.S.C. § 721. Authority to operate a business in a chapter 7 proceeding is appropriate "in a limited number of situations, *such as where it appears that a business could be sold for a greater price as a going concern than would be obtained in ordinary liquidation.*" In re A&T Trailer, Inc., 53 B.R. 144, 147 (Bankr. D. Wyo. 1985); In re Lason, Inc., 300 B.R. 227, 233 (Bankr. D. Del. 2003) (recognition that liquidation in chapter 7 may occur under "forced sale" conditions or as a going concern with section 721 authority) (emphasis added).

29. The statutory option for a chapter 7 trustee to run a debtor's business on a limited basis contemplates circumstances where preserving assets pending a future sale may result in an increased benefit to the estate as opposed to an immediate cessation of operations and piecemeal

13

liquidation. See, e.g., In re Quarter Moon Livestock Co., 116 B.R. 775, 782 (Bankr. D. Idaho 1990) (authorizing trustee to operate debtor's cattle business "to wait until fall roundup and sell the cattle herd, and to maintain livestock until that time"). The Court has discretion in considering requests to operate a debtor's business under section 721. In re Heissinger Res. Ltd., 67 B.R. 378, 384 (C.D. Ill. 1986).

30. In these cases, the Trustee's authority for operating the Debtors' business as a going concern will be limited to the preservation and collection of the Debtors' assets, including the prosecution of the Weatherford Claim, the Litigation Actions and the Avoidance Actions to final resolutions, and the authority to engage the assistance of CMS and its employees with respect to the Debtors' business and assets. The Trustee will undertake his traditional duties in preserving the value of the Debtors' assets, and will engage CMS to help identify and sell the Debtors' assets.[7]

31. In connection with services that CMS renders in providing accounting information and documentation on the Contracts and Projects to surety companies and to other third parties, the Trustee requests that CMS be compensated on an hourly basis at the hourly rate of $74.00 for each professional and staff employee of CMS who renders services in this capacity. Prior to rendering services mentioned in this paragraph on any Project, CMS shall obtain the written authorization from the Trustee to commence its services for each Project.

---

[7] Pursuant to the terms of the MOU, the Estates shall be entitled to receive (i) four percent (4%) of (w) any payment actually received by the Trustee and/or the Estates in respect of the Weatherford Claim, after payment of (x) all BMO Weatherford Fees and Expenses (as defined in the MOU), and (ii) ten percent (10%) of (y) any collections actually received by the Trustee and/or the Estates in respect of the BMO Collateral excluding recoveries on the Weatherford Claim but including any collections or recoveries on account of the AIG Claims (as defined in the MOU), the Evergreen Claims (as defined in the MOU) or the Tax Refund Claims (as defined in the MOU) that are asserted under chapter 5 of the Bankruptcy Code or otherwise, but only to the extent that the asserted claims under chapter 5 of the Bankruptcy Code call for recovery of BMO Collateral, after payment of (z) all Trustee Fees and Expenses (as defined in the MOU) and BMO Claim Fees and Expenses (as defined in the MOU).

32. The Trustee has reviewed these terms and believes that they are fair and reasonable.

33. Limited authority for the Trustee to operate the Debtors' business and engage CMS as consultants, as set forth above, will maximize value of the Debtors' assets to the Estates. If the Trustee were not granted the authority to operate the Debtors' business as a going concern and to engage the assistance of CMS as consultants, the potential to maximize the value of the Debtors' assets would be drastically reduced. Absent the assistance of CMS, it would be unlikely that the Trustee and his professionals would be able to locate and identify a significant percentage of the Foreign Assets, or support the claims asserted in the Litigation Actions and the Avoidance Actions.

34. At this time, the Trustee is not in a position to predict how long he will require CMS' services and operate under 11 U.S.C. § 721. Therefore, the Trustee seeks the authority pursuant to 11 U.S.C. § 721 to operate the Debtors' business for a limited period through and including December 5, 2014, without prejudice to the Trustee's right to seek additional time to operate the Debtors' business pursuant to 11 U.S.C. § 721. Additionally, in consultation with the Office of the United States Trustee, the Trustee will fulfill his obligations under section 704(a)(8) and will provide and file monthly reports and summaries of the operation of the Debtors' business (an "<u>Operating Report</u>") for each month or part of a month that the Trustee operates the Debtors' business under 11 U.S.C. § 721, which Operating Report shall include, but not be limited to, a statement of receipts and disbursements during the applicable period.

35. Therefore, based on the foregoing, the Trustee submits that grounds exist for granting the Trustee authority to operate the Debtors' business as a going concern and to engage

CMS as his consultants for a limited period of time and that such authority is in the best interests of the Debtors, their creditors, and their estates.

## NOTICE

36. Notice of this Motion has been provided to (i) the Office of the United States Trustee for the District of Delaware, (ii) counsel to the Debtors, (iii) all parties requesting notices pursuant to Bankruptcy Rule 2002, and (iv) and in accordance with this Court's July 2, 2014 *Order Pursuant to 11 U.S.C. §§ 102 and 105(a) and Fed. R. Bankr. P. 2002(m) and 9007 Establishing Notice and Service Procedures* [D.I. 105]. The Trustee submits that no other or further notice need be provided.

**[Remainder of page left intentionally blank]**

**CONCLUSION**

WHEREFORE, the Trustee respectfully requests entry of an order (i) approving the Motion; (ii) granting the Trustee the authority to operate the Debtors' business for a limited period through and including December 5, 2014, without prejudice to the Trustee's right to seek additional time to operate the Debtors' business pursuant to 11 U.S.C. § 721; (iii) granting the Trustee the authority to engage CMS as his consultants; and (iv) granting the Trustee such other and further relief as the Court deems just and proper.

        Respectfully submitted,

        **FOX ROTHSCHILD LLP**

        By: */s/ L. John Bird*
            L. John Bird
            Delaware Bar No. 5310
            919 North Market Street, Suite 300
            Wilmington, DE  19801-2323
            Phone (302) 654-7444/Fax (302) 656-8920
            lbird@foxrothschild.com

            -and-
        Michael G. Menkowitz
        Jason C. Manfrey
        2000 Market Street, 20th Floor
        Philadelphia, PA  19103-3222
        Phone (215) 299-2000/Fax (215) 299-2150
        mmenkowitz@foxrothschild.com
        jmanfrey@foxrothschild.com

        *Attorneys for Alfred T. Giuliano, Chapter 7 Trustee*
        *for the estates of LTC Holdings, Inc., et al.*

Dated:  August 15, 2014