## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| LTC Holdings, Inc., *et al.,* | ) | Case No.: 14-11111 (CSS) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| ———————————————— | ) | |
| Alfred T. Giuliano, Chapter 7, | ) | |
| Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No.: 15-51889 (CSS) |
| | ) | |
| The Insurance Company of the | ) | |
| State of Pennsylvania, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |
| Alfred T. Giuliano, Chapter 7 Trustee, | ) | |
| | ) | |
| v. | ) | Adv. No.: 16-51036 (CSS) |
| | ) | (consolidated with Adv. No. 15-51889) |
| The Insurance Company of the State | ) | |
| of Pennsylvania, Lexon Surety Group | ) | |
| LLC d/b/a Lexon Insurance Company | ) | |
| And Bond Safeguard Insurance | ) | |
| Company. | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

### <u>OPINION</u>

**Klehr Harrison Harvey Branzburg LLP**
Richard M. Beck
919 Market Street, Suite 1000
Wilmington, DE 19801
-and-
**Chapman and Cutler LLP**
David T. Audley
Michael T. Benz

**Whiteford Taylor & Preston LLC**
Thomas J. Francella, Jr.
405 North King Street 500
Wilmington, DE 19801
-and-
**Chiesa Shahinian & Giantomasi PC**
Armen Shahinian
Andrew S. Kent

111 West Monroe Street
Chicago, Illinois 60603

Counsel for BMO Harris Bank, N.A.

**Fox Rothschild LLP**
Seth A Niederman
919 Market Street, Suite 300
Wilmington, DE  19899-2323
        -and-
Michael G. Menkowitz
William H. Stassen
Dana S. Katz
2000 Market Street, 20th Floor
Philadelphia, PA  19103-3222

Counsel for Alfred T. Giuliano
Chapter 7 Trustee for the Estate of
LTC Holdings, Inc., et al.,

Dated:  February 4, 2019

Sontchi, C. J._____

Scott A. Zuber
One Boland Drive
West Orange, NJ  07052

Counsel for the Insurance Company of
the State of Pennsylvania

## INTRODUCTION

Subrogation allows a surety to step into the shoes of its obligee. However, subrogation need not permit the surety to step into these shoes when an obligee is still wearing them. Here, a surety moves for summary judgment on its ability to do just that. In opposition, the first lien creditor moves for summary judgment on the basis that the obligee's waiver of its setoff rights extinguished any possibly of subrogation. The Court will grant summary judgment to the creditor. This decision turns on two questions. First, can a surety's action, short of actual payment, "effectively discharge" a debt and constitute full payment for purposes of subrogation, pursuant to 11 U.S.C. § 509, when the obligee has not accepted that action as full payment? The Court holds that it can not.

2

Second, can an obligee waive its setoff rights when the surety would have been subrogated to them but for its claim being subordinate to the obligee's claim? The Court holds that it can.

Once a surety has finished its work, it inherits the obligee's rights. Until such completion, the obligee retains its rights to protect itself against exposure from the secured project. But even when a surety has fully performed, it need not be subrogated to obligee's rights when that obligee has claims against the principal and wishes to use its rights to vindicate its own interests. These enduring principles have animated common law for decades. In 1978, a revamping of the Bankruptcy Code created a statutory right to subrogation during the time a debtor is in bankruptcy. In a departure from common law, 11 U.SC. § 509 permitted partial subrogation. That is, subrogation to the extent of performance. However, the Code still subordinated this right until the obligee has been paid in full. Thus, the obligee's claims remain superior to the surety's competing claims. The obligee's ability to exercise dominion over its own right to setoff mutually offsetting debts, including by waiving that right, take precedence over surety's claim to be subrogated to the same. The Court will grant summary judgment to the creditor for the entire refund. Any amount that this creditor does not receive by virtue of the setoff waiver, it receives by dint of its status as a first lien creditor.

The Court also addresses the *Bob Richards Rule* – the default when affiliates fighting over a tax refund have no tax-sharing agreement. This rule states that the entity that causes the loss receives the refund generated by it. Creditor urges strict fealty to this rule, which would increase the size of the mutually offsetting debt. However, *Bob Richards*

3

articulates a principle of equity, not a hard and fast rule. It is meant to curb the unjust enrichment of parent companies who pocket refunds when the only reason that the refunds do not go to the loss-producing subsidiary is because regulations require the parent to act as the sole agent. Because the parent may not have been a mere procedural conduit here, it may be entitled to a piece of the tax refund.

## JURISDICTION & VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## PROCEDURAL HISTORY

Debtor Lakeshore Toltest Company ("LTC") is a construction company and parent of construction companies Toltest, Inc. ("Toltest") and Lakeshore Engineering Services ("LES"), collectively "Debtors."[1] The United States had retained Debtors to perform several construction projects, including structures in the Middle East for the Department of Defense.

On May 2, 2014 ("Petition Date"), Debtors filed voluntary Chapter 7 petitions. Two and half years later, the Trustee filed a complaint against the Insurance Company of the State of Pennsylvania ("ICSP"), a surety for several Debtor Government contracts.[2] The complaint alleges, among other things, that ICSP forced Debtors to enter into an

---

[1] LTC also has a parent and affiliate debtors, which are not implicated here. The organizational chart in D.I. 83, at p.13 may prove useful.

[2] Adv. Pro. 15-51889. All "D.I."s refer to this proceeding unless otherwise stated.

unfavorable financing arrangement while they were struggling financially. At the end of 2017, ICSP made two motions for summary judgment, one of which is at issue here. On the same day, it moved for summary judgment on the first five counts of the complaint and separately on the ownership of Debtors' escrowed tax refund to which Debtors had given up claim in a Court-approved settlement with the United States. The next day, BMO Harris Bank N.A. ("BMO") – Debtors' first lien creditor[3] – fired back with its own motion for summary judgment on the tax refund. This opinion addresses the cross motions for summary judgment on the escrowed tax refund.

The United States has an amended proof of claim #217-2 ("USPOC #217-2") and BMO has filed proof of claim #153 for over $39 million – both against LTC's ultimate parent, but including the Debtors.

## STATEMENT OF FACTS

### A. When Debtors were unable to finish some Government contracts, surety ICSP had to step-in.

The United States hired LTC to build the National Police Command Center in Afghanistan ("NPCC") and LES to build the Al Dhafra air base in United Arab Emirates ("Al Dhafra").[4] ICSP, an AIG affiliate, was retained as surety.[5]

Around September 2009, ICSP issued to the Debtors a series of bonds ("Bonds") on these and other Government contracts ("Bonded Contracts"), guaranteeing that the

---

[3] Del. Bankr. 14-11111 D.I. 110, at ¶9.

[4] USPOC #217-2, at p. 144 and p. 147. The NPCC contract was awarded to LTC on March 20, 2012. The Al Dhafra contract was awarded to LES on May 6, 2011.

[5] AIG or its affiliates were also the sureties for Debtors' other contracts with the United States.

contracts would be completed.[6] At about the same time, LES and ICSP executed an indemnity agreement, which Toltest and LTC joined the following year (collectively the "Agreement of Indemnity").[7] This agreement required Debtors to indemnify ICSP against all loss, claims or liabilities arising under or incurred due to the Bonds.

The United States deemed Debtors to have breached some of their Bonded Contracts, including those for the construction of Al Dhafra and NPCC.[8] It terminated LTC's right to proceed under the NPCC Contract for default on January 21, 2014.[9] Though LTC protested, it was unable to finish the NPCC. At a cost over $12 million, LTC stepped in to assure completion.[10] On April 29, 2014, days before the Petition Date, LES voluntarily repudiated its Al Dhafra contract.[11]

Later that summer, ICSP, the United States, and a contractor named Macro Vantage Levant JLT ("Macro Vantage") entered into an agreement ("NPCC Agreement") whereby Macro Vantage would finish the NPCC. Macro Vantage completed the project, and – according to ICSP – the United States released ICSP from further suretyship obligations under the NPCC Agreement.[12]

---

[6] D.I. 90-2, at ¶ 12; D.I. 20 (Counterclaims), at ¶¶ 7-9; D.I. 18, at ¶ 12; D.I. 18-1; D.I. 20, at ¶ 12.

[7] D.I. 90, at pp.4-5; D.I. 78, at p. 7; D.I. 79-1, at ¶¶ 4-5; D.I. 77-3; D.I. 77-4.

[8] Del. Bankr. No. 14-11111 D.I. 662-1, at p.4; USPOC #217-2, at p. 144 and p. 147; Del. Bankr. No. 15-51889 D.I. 77-2, at first Whereas.

[9] D.I. 79-3; USPOC # 217-2, at p.144.

[10] D.I. 92-8, at p.10.

[11] USPOC #217-2, at p.147.

[12] D.I. 79-5; D.I. 79-7. Though 79-7, attesting to the release, is yet to be authenticated, the Court anticipates that it will be.

**B. Factual uncertainties regarding tax payments and the size of claims.**

Articulating the following factual complexities and disagreements elucidates the context in which these events took place. It helps establish the factual background of this opinion.

*1. Who owned the Tax Refund: LTC or LES?*

In early 2014, LTC filed a consolidated federal tax return for 2013.[13] The return showed net operating losses of about $28 million for the year.[14] LTC sought to carryback this loss and attain a refund of approximately $5.5 million ("Tax Refund") in federal income taxes paid in 2011.[15] The United States refused to release the Tax Refund and asserted setoff rights for the contracts on which it claimed Debtors defaulted.

ICSP contends that this refund belongs to LTC because it paid all the taxes from its own account.[16] BMO counters that in the absence of a tax-sharing agreement, the *Bob Richards Rule* dictates that the refund belongs to LES, the subsidiary that generated the loss that brought about the Tax Refund.[17] It also takes issue with ICSP's assertion that LES itself did not contribute to the taxes.[18] BMO notes that LES made transfers into LTC's account and denies ICSP's claim that these transfers were loan repayments.[19] To make a

---

[13] D.I. 79, Ex. M(1); D.I. 20 (Counterclaim), at ¶20; D.I. 83, at pp. 7-8.

[14] D.I.79, Ex. M(1); D.I. 20 (Counterclaim), at ¶20; D.I. 83, at pp. 7-8.

[15] D.I. 79, Exs. M(1) and M(3); D.I. 20 (Counterclaim) at ¶20; D.I. 83, at pp. 7-8.

[16] D.I. 80, at p.7.

[17] D.I. 89, at p.21.

[18] D.I. 89, at p. 28.

[19] D.I. 89, at p. 25.

long story short, the issue of whose money was used for the tax payment is fraught with minutia, complexity, and ambiguity. Regardless of who receives the benefit of the doubt, no reasonable fact-finder could be certain who paid.

2. *What was the size of the Government's mutually offsetting claims against Debtors?*

Due to the "complex relationships" among the Debtors and between individual Debtors and the United States, the United States could not determine each Debtor's liability.[20] As of May 24, 2016, the amendment to its proof of claim, the United States estimated that it had at least $68,040,956.58 in fixed, non-contingent claims against LES and at least $893,110 in such claims against parent LTC.[21] This proof of claim does not indicate the source of the fixed LTC claim. The Court, thus, can not determine whether it is tied to NPCC or to another project. Fixed claims against Toltest exceeded $15 million.[22] The United States' $84 million in contingent claims includes a $24,320,207.42 NPCC claim and a $608,886.05 Al Dhafra claim, both of which were estimates "subject to significant revision."[23] Importantly, the United States would not commit to any figure. And it even qualified these estimates by saying that its contingent claims figures were subject to significant revisions and that more fixed claims may be found.[24] No other evidence on the size of these claims exists. This is hardly sturdy ground upon which to base a finding of mutuality.

---

[20] USPOC #217-2, at p.6.
[21] USPOC #217-2, at p.6.
[22] *Id.*
[23] USPOC #217-2, at p.88. (W912DQ-12-C-4004 corresponds to NPCC and W912ER-11-C-0039 to Al Dhafra.) The balance is owed by Lakeshore Toltest Joint Venture. USPOC #217-2 does not explain what this entity is.
[24] USPOC #217-2, at pp.6 and 88.

**C.  The United States and Debtors agree to a Settlement releasing the United States' rights to the Tax Refund.**

Rather than untangle these relationships to determine how much it could setoff against each Debtor, the United States entered into a settlement and stipulation (collectively "Settlement") with Debtors.[25] The Debtors gave up their contract claims against the United States in exchange for the United States waiving its setoff rights against their Tax Refund.[26] The Court approved the Settlement and it became effective June 29, 2016.[27]

Per the Settlement, the Trustee is holding the Tax Refund in escrow. A dispute between BMO and ICSP over the Tax Refund has spawned the instant motions. Over the course of almost two years – from October 2014 to September 2016 – ICSP spent about $12 million on the NPCC.[28] And it claims the right of subrogation to the Tax Refund to get some of this money back.

**D.  As of the effective date of the Settlement, ICSP had not made all its payments on the NPCC and Al Dhafra projects. But at least on the NPCC project, it had paid an amount over the Tax Refund.**

ICSP points to an unauthenticated exhibit to prove that the United States released it from its suretyship obligations.[29] In a letter dated August 24, 2016 – about two months after the Settlement's effective date – the United States informed Macro Vantage that its

---

[25] LTC's parent and affiliate debtors were also party to this Settlement.

[26] Del. Bankr. No. 14-11111 D.I. 923 and D.I. 662.

[27] *Id.*

[28] D.I. 92-8, at p.10.

[29] This Court anticipates that ICSP will be able to authenticate this exhibit. The Court incorporates the exhibit to give a comprehensive view of ICSP's argument. This opinion does not rely on the exhibit.

NPCC work is finished effective February 11 that same year.[30] This letter "also releases the surety from all further liability and responsibility from the tendered agreement." Curiously, the United States did not send this letter to ICSP.  And the parties do not provide other communications attesting to the date when ICSP purportedly satisfied its surety requirements.

However, the Court does have information concerning the amount and timing of ICSP's payments for the NPCC and Al Dhafra projects. ICSP asserts that as a surety, it has been subrogated to the United States' rights on its payments totaling $12,646,454.02 on LTC's NPCC project and $1,018,629.03 on LES's Al-Dhafra project.[31] ICSP made some of these payments after the effective date of the Settlement, in which the United States released its setoff rights. The subsequent payments are: $2,083,562.86 consisting of three payments on NPCC and $397,132.99 split between two payments on Al Dhafra.

### E.  ICSP and BMO clash over ownership of the Tax Refund.

ICSP argues that, as the United States' subrogee, it is owed the Tax Refund. It argues that had the United States been forced to finish LTC's NPCC job, it would have been able to exercise its setoff rights to offset its costs. As the United States' subrogee, ICSP says that it should be able to do the same. ICSP contends that the requisite mutuality of claims existed between the United States and LTC because LTC was owed the Tax Refund and the United States had claims against LTC (pertaining to the NPCC project.)

---

[30] D.I. 79-7.

[31] D.I. 85, at response 1 and pp.10-14. USPOC #217-2 p.143 and p.148; D.I. 20 (Counterclaim), at ¶ 12. The proof of claim does not explain what this entity is.

BMO denies the mutuality by denying that LTC was owed the Tax Refund and further responds that ICSP's rights were not yet subrogated at the time of the Settlement. In any event, BMO continues, the United States had superior rights in the Tax Refund because it had its own claims against Debtors to offset.[32] So, the United States' release of its rights also extinguished ICSP's potential subrogation rights. Hence, ICSP would never have been entitled to the Tax Refund.

## ANALYSIS

### A.  Setoff rights v. first lien creditor rights

Neither party contests that the Government's setoff right takes priority over even the rights of a first lien creditor to recover.

### B.  Fed. R. Civ. P. 56 – Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[33] Where the record taken as a whole could not lead a rational trier of fact to find for the summary judgment nonmovant, there is no genuine issue for trial.[34] In deliberating, courts must believe the non-movant's evidence and draw all reasonable inferences in his favor.[35]

---

[32] D.I. 83, at pp. 26-27.

[33] Fed. R. Civ. P. 56.

[34] *Ricci v. DeStefano*, U.S.2009, 129 S.Ct. 2658, 557 U.S. 557, 174 L.Ed.2d 490.

[35] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986.

### C. *Bob Richard Rule*

BMO submits that even if LTC paid the tax liability, awarding it the Tax Refund would violate the *Bob Richards Rule,* the default in the absence of a tax-sharing agreement because LES generated the loss that resulted in the refund.

The *Bob Richards Rule* provides that the entity that generates the tax liability is entitled to the refund.[36] BMO says that LES generated both the 2011 income and 2013 losses that resulted in the Tax Refund and that it made the tax payments.[37] The court in *Bob Richards* is animated by the possibility of unjust enrichment.[38] It is concerned about circumstances where one company claims a refund that was generated solely by the losses of another. The litmus test of *Bob Richards* is, is the only reason the refund does not go directly to the subsidiary "because income tax regulations require that the parent act as the sole agent"?[39] If LTC paid the underlying tax liability from its own funds, as ICSP says, these would not be the facts before the Court now. LTC would not be acting as a procedural conduit.[40] LTC's refund would have been triggered by its own overpayment,

---

[36] D.I. 89, at pp. 20-21. The Third Circuit has not explicitly adopted this rule at the appellate level, though lower courts have cited it. Moreover, the Third Circuit has implied that it would follow this rule. It wrote that *Bob Richards* was not applicable to a particular case "because the parties have agreed to a [tax-sharing agreement.]" *In re Downey Fin. Corp.,* 593 F. App'x 123, 126 (3d Cir. 2015) The implication being that but for that agreement, the default or *Bob Richards Rule* would have controlled.

[37] D.I. 89, at p.34.

[38] *In re Bob Richards Chrysler-Plymouth Corp., Inc.,* 473 F.2d 262, 265 (9th Cir. 1973) "Allowing the parent to keep any refunds arising solely from a subsidiary's losses simply because the parent and subsidiary chose a procedural device to facilitate their income tax reporting unjustly enriches the parent."

[39] *In re Bob Richards Chrysler-Plymouth Corp., Inc.,* 473 F.2d 262, 265 (9th Cir. 1973).

[40] D.I. 80, at p.23.

not solely by LES's losses. LTC would not be unjustly enriched by receiving a refund resulting from paying too much out of its own pocket.

### D. The United States had a common law right to setoff fixed claims pursuant to 11 U.S.C. § 553.

Bankruptcy has long recognized the equitable right to setoff mutually offsetting debt. 11 U.S.C. § 553, the section of the Code governing setoff, preserves these rights, as well as those setoff rights available by law. But it does not create any setoff rights on its own. It only vivifies pre-existing rights. However, jurisdictions have varying approaches to setoff rights. For example, New York prohibits the setoff of contingent claims. This Circuit offers courts "broad equitable discretion" in recognizing the existence and contours of setoff rights.

Here, the parties do not indicate what the applicable law is for purposes of setoff. Nor does the Court have sufficient factual information to determine this on its own.

Throughout its proof of claim, the United States repeated and implied that it was reserving its setoff rights under 11 U.S.C. § 553.

Despite jurisdiction discord over the setoff of contingent claims, courts have consistently recognized the creditor's bedrock equitable right to deduct the amount it unquestionably owes the debtor from the amount the debtor unquestionably owes it. And the Supreme Court favors setoff and affords the Government the same setoff right as any other creditor.[41]

---

[41] *United States v. Munsey Tr. Co. of Washington, D.C.,* 332 U.S. 234, 239, 243 67 S. Ct. 1599, 1602, 1604 91 L. Ed. 2022 (1947).

This Court recognizes the United States' common law right to setoff fixed debts against the mutually offsetting portion of the Tax Refund.

### E.   § 509 subordinates ICSP's interest to be subrogated to the obligee United States' setoff rights until the United States has had its claims paid in full.

Neither party has clearly identified the jurisdiction that governs the accrual of subrogation rights. BMO implies that New York law governs because of the Agreement of Indemnity, but also allows that 11 U.S.C. § 509 might control.[42] It thinks that the Code would result in the same outcome as New York law. ICSP relies on § 509 and related case law from the Second Circuit.[43] Both parties rely upon equitable subrogation. First, this section of the opinion explains why BMO's Agreement of Indemnity argument is wrong and then why § 509 controls.

Debtors and ICSP, the parties to the Agreement of Indemnity, agreed that it will be "governed by and construed in accordance with the law of the State of New York."[44] And that Debtors "shall be subject to the jurisdiction of the federal courts, or if such courts do not have jurisdiction then the state courts, located in the Borough of Manhattan in the State of New York."[45] The Agreement of Indemnity does not discuss surety ICSP's ability to be subrogated to the rights of the United States, which is not a party to the agreement. In fact, it does not mention subrogation at all except to say, "rights granted herein, will

---

[42] D.I. 83, at pp. 15, 34-36.

[43] D.I. 84, at pp. 25-26.

[44] D.I. 77-3, at §7.10 ("This Agreement shall be governed by and construed in accordance with the law of the State of New York without regard to conflict of laws principles.")

[45] *Id.*

not be deemed a waiver of Surety's equitable subrogation rights or other rights, said security and rights being in addition to the rights of exoneration, subrogation, and other rights to which Surety is entitled to under law or in equity."[46] Because the subrogation of the Unites States' rights to ICSP would necessarily remove those rights from the United States, the United States would have to be party to any choice of law agreement concerning subrogation. As it's not a party to the Agreement of Indemnity, this agreement can not control the choice of law for purposes of subrogation.

Because the Bankruptcy Code has no preemption clause, bankruptcy proceedings sometimes involve the application of state law. For example, the Third Circuit recognizes both equitable subrogation and state subrogation laws in a bankruptcy context. However, some preemption is unavoidable. A prime example is subrogation. Common law typically requires full performance for subrogation.[47] Standing apart, the Bankruptcy Code permits partial subrogation – subrogation to the extent of payment.[48] Both equitable subrogation and subrogation under § 509 allow for prioritization of certain claims. For

---

[46] *Id.*, at §7.12.

[47] *Earl Dubey & Sons, Inc. v. Macomb Contracting Corp.*, 97 Mich. App. 553, 296 N.W.2d 582, 29 U.C.C. Rep. Serv. 1676 (1980); *23 Mich. Civ. Jur. Suretyship* § 70; *See also, Bd. of Cty. Rd. Comm'rs of Calhoun Cty. v. S. Sur. Co.*, 216 Mich. 528, 531, 185 N.W. 755, 757 (1921). *Reserves Dev. LLC v. Severn Sav. Bank, FSB*, No. CIV.A. 2502-VCP, 2007 WL 4054231, at *17 (Del. Ch. Nov. 9, 2007), *aff'd*, 961 A.2d 521 (Del. 2008); *Travelers Cas. & Sur. Co. of Am. v. Colonial Sch. Dist.*, No. 18167, 2001 WL 287482, at *6 (Del. Ch. Mar. 16, 2001). *Bank of Pennsylvania v. Potius*, 1840 WL 3831 (Pa. 1840); *Pub. Serv. Mut. Ins. Co. v. Kidder-Friedman*, 1999 PA Super 310, ¶ 7, 743 A.2d 485, 488 (1999); *Universal Bonding Ins. Co. v. Gittens & Sprinkle Enterprises, Inc.*, 960 F.2d 366, 376 (3d Cir. 1992). *City of New York v. Cross Bay Contracting Corp.*, 235 A.D.2d 10, 662 N.Y.S.2d 462, at 753 (App.Div.1997), rev'd on other grounds, 93 N.Y.2d 14, 686 N.Y.S.2d 750 709 N.E.2d 459 (N.Y.1999), *Fed. Ins. Co. v. Arthur Anderson & Co.*, 75 N.Y.2d 366, 553 N.Y.S.2d 291, 552 N.E.2d 870, 872 (N.Y.1990), *Am. Sur. Co. v. Palmer*, 240 N.Y. 63, 147 N.E. 359, 360 (N.Y.1925). 11 U.S.C. § 509(a).

example, equity may bar subrogation in the face of an obligee's competing claims. And §
509 subordinated the surety's entire claim until its obligee has been paid in full.

Because a partially performing party can not be simultaneously subrogated to some
rights and not subrogated to any rights, the federal statute prevails. Here, where the
Court is grappling with subrogation rights tied to post-Petition Date payments, the Code
applies. Therefore, partial subrogation is possible, but subordinated until the obligee is
paid in full.

§ 509 does not specify whether the obligee must have all its claims against the
Debtor paid off in order for surety's claim to no longer be subordinate to obligee's – or if
paying off the obligee's claims under the secured project is enough to subrogate the
surety to obligee's equitable or legal setoff rights even if the obligee could have exercised
these rights to setoff its remaining claims arising under a different contract. Put
differently, does a surety's performance on one contract entitle it to subrogation even
when the obligee could still exercise these rights in a different contract? The statute's
language hints at a narrow construction. Under § 509(c), the subrogated claim of entity
that has secured "such creditor's claim" is subordinate until "such creditor's claim is paid
in full." However, the Code was not passed – and does not operate – in a vacuum. It is
possible that the Code did not contemplate such a complicated scenario, where
subrogation in one context may deprive the obligee of this right in another context. Thus,
a broader approach, where the Code allows, or leaves room for other law to allow,
obligees to retain their rights where they may serve a useful purpose. Case law does not
clarify this ambiguity. Even if § 509 is agnostic on this issue, it may be resolved by

utilizing outside subrogation law. However, as noted, the Court can not presently determine which law would apply, it does not do so here. Instead, it will entertain both the broad and the narrow approaches.

**F. The United States had its own claims to offset on the effective date of the Settlement and its rights to use the Tax Refund to setoff its losses are superior to any subrogation rights ICSP might claim. Accordingly, under the broad approach to § 509, the United States retained control over its setoff rights, including its ability to waive them.**

Equitable subrogation postpones subrogation of the obligee's setoff rights until that obligee's own claims have been satisfied. So long as the obligee has its own claims to setoff, those are superior to surety's right to be subrogated to those rights. Until those claims are fully paid, the obligee retains the option to exercise setoff rights to vindicate its own interest. Thus, it does not lose its ability to protects itself against potential exposure from an unfinished project. To hold otherwise could allow parties to hijack the doctrine of subrogation to give themselves priority over the Government's competing claims. Though controlling precedent is sparse, the Supreme Court has distinguished between cases where the obligee has its own claims and those where it is "a mere stakeholder and had no rights of its own to assert."[49]

Similarly, under the Code subrogated parties may not receive payment until the obligee has been paid in full. § 509 subordinates subrogated claims for the benefit of the obligee until creditors have been paid in full.[50] It places the surety in line behind the

---

[49] *United States v. Munsey Tr. Co. of Washington, D.C.*, 332 U.S. 234, 240, 67 S. Ct. 1599, 1602, 91 L. Ed. 2022 (1947).

[50] 11 U.S.C. § 509(c).

obligee, who may exhaust the funds to satisfy his own claim, even if this comes at the surety's expense. However, the Code does not delineate whether the obligee may waive the setoff rights to which the surety is subordinate. Nevertheless, the Code prioritizes the obligee's exercise of setoff rights and is unambiguous that the rights have been subordinated "for the benefit of" the obligee. And ICSP has not cited anything that bars the United States from releasing its setoff rights. In fact, *Chateaugay I* and *Chateaugay II*, a pair of Second Circuit cases on which ICSP relies, actually undercut ICSP by supporting the superior rights of an obligee with surviving claims.

First, *Chateaugay I* reaffirms the Code's circumscription of subrogation when the obligee has yet to be fully paid. In *Chateaugay I*, unlike here, the primary creditor had been paid in full. When a primary creditor has not been paid in full, surety can not receive full payment.[51] In fact, surety's "ability to be subrogated in any way would be in question."[52]

Second, *Chateaugay II* harms ICSP's cause in a related – and more specific – way. It allows obligees with their own claims to offset to waive their setoff rights and eliminate the surety's possibility of subrogation. That case had the following timeline. First, surety Aetna issues a $5.5 million bond to pay for LTV Steel's black lung claims. A few years later, LTV Steel files for Chapter 11 bankruptcy. Per law, LTV Steel stops payment on these claims and the Department of Labor temporarily bears this responsibility. Surety Aetna begins to pay black lung claims and does so to the extent of its bond. Once the

---

[51] *In re Chateaugay Corp.*, 89 F.3d 942, 948 (2d Cir. 1996), (*Chateaugay I*); 11 U.S.C. § 509(c).

[52] *In re Chateaugay Corp.*, 89 F.3d 942, 948 (2d Cir. 1996).

bond is exhausted, the Department of Labor – per law – continues to pay the rest of the black lung claims. Only after all of this, do Aetna and the Department of Labor file proof of claims.[53] Aetna later asserts that it is subrogated to the Department of Labor's setoff rights. The court agrees that Aetna has been subrogated. But, crucially for ICSP, it holds that the Department of Labor could have waived this right in a proof of claim, even when that proof of claim was filed after the surety had made payments during the bankruptcy.[54]

The totality of the law indicates that the Code permits obligees to waive their setoff rights.

**G. ICSP did not fulfill its NPCC suretyship obligations prior to the effective date of the Settlement. Therefore, the United States had surviving claims stemming not only from other LTC deals, but also from the very contract that caused ICSP to claim subrogation rights. Thus, under the narrow approach to § 509, any setoff rights the United States had in its then contingent claims were superior to ICSP's subrogation rights and the Government retained its right to waive them.**

1. *Payment of debt does not require an actual payment of money. A discharge of the obligation that is accepted as payment suffices.*

"Payment in the technical sense is not required" to pay debt.[55] "Whatever discharges the liability and is accepted as payment is sufficient."[56]

---

[53] *In re Chateaugay Corp.*, 94 F.3d 772, 774 (2d Cir. 1996), ("*Chateaugay II*").

[54] *In re Chateaugay Corp.*, 94 F.3d 772, 776 (2d Cir. 1996).

[55] *Feldhahn v. Feldhahn*, 929 F.2d 1351, 1354 (8th Cir.1991).

[56] 73 Am.Jur.2d Subrogation § 29 (1974). *See also Benedictine Hosp. v. Glessing,* 90 A.D.3d 1383, 1386, 935 N.Y.S.2d 683, 686–87 (2011) (saying that the doctrine of subrogation applies to the use of property in discharging a debt); *In re Chateaugay Corp.*, 89 F.3d 942, 948 (2d Cir. 1996) ("It is immaterial how surety satisfied its obligation, so long as it discharged it."); *Feldhahn v. Feldhahn*, 929 F.2d 1351, 1354 (8th Cir. 1991); *In re Wingspread Corp.*, 145 B.R. 784, 788 (S.D.N.Y. 1992), aff'd sub nom. *Wingspread Co. v. Paramount Comm.*, 992 F.2d 319 (2d Cir. 1993).

*2. ICSP had not discharged its suretyship obligations as of the effective date of the Settlement.*

ICSP argues that under *Chateaugay I*, a promise to make future payment is sufficient to constitute payment for the purposes of subrogation under the Bankruptcy Code because that promise effectively discharges the debt and thus subrogates the surety to the obligee's rights.[57] The surety does not claim that it *actually* made all required payments before the Settlement went into effect. But it writes that its prior "binding commitment" to pay for Macro Vantage to complete NPCC was sufficient to constitute payment because it released the United States from its obligations.[58] Thus, ICSP contends that it "fully performed its obligations as surety under LTC's relevant contract with the United States, and…was a fully-subrogated surety, prior to the effective date of the" Settlement.[59] The surety believes that it would be unfair to deny it the rights that would have been available to the obligee.  By the effective date of the Settlement, it had spent over $10 million on NPCC and does not want to be in a worse position than the Government would have had to endure had it been forced to complete the contract on its own.

BMO counters that ICSP misreads the precedent. It points out that, unlike the instant case, the obligee had not released its setoff rights in *Chateaugay II.*[60] And

---

[57] *In re Chateaugay Corp.*, 89 F.3d 942, 948 (2d Cir. 1996).

[58] D.I. 84, at pp.23-24.

[59] D.I. 84, at p.8.

[60] Though BMO cites facts in *Chateaugay II* to rebut *Chateaugay I,* this is appropriate because the relevant texts in both cases reference the same events.

*Chateaugay II* itself states that had it waived those rights, such waiver would have erased the surety's interest.[61] Therefore, ICSP's reliance on the *Chateaugay* cases is inapposite.

BMO is correct.

In both appellate cases on which *Chateaugay I* relies, the determination than an act has discharged an obligation turns on the transferee or assignee treating the transfer or assignment as satisfying the debt. For example, in *Feldhahn,* the court treated the obligation as discharged because the bank cancelled the note it held for a divorced couple's debt after the non-debtor wife assigned it the proceeds from a contemplated real estate sale.[62] And in *Wingspread*, the court treated the debt as discharged because after "Paramount paid Dow a sum equal to the lease defaults…Dow released Paramount from obligation for the defaults."[63] Thus, in each case, the court's determination echoes the pre-existing understanding and behavior of both parties. Likewise, secondary sources refer to the acceptance of a transfer as payment as an element of payment.[64]

These cases are notable because it would have been impractical for the courts to not treat the transfer and assignment as payment. To do so could run the risk of trapping parties in a legal limbo. It would result in the law not acknowledging the factual reality that both parties had viewed an act as having paid the debt. And it would discourage

---

[61] D.I. 89, at p.32, citing *In re Chateaugay Corp.*, 94 F.3d 772, 776 (2d Cir. 1996).

[62] *Feldhahn v. Feldhahn*, 929 F.2d 1351, 1352 (8th Cir. 1991).

[63] *In re Wingspread Corp.*, 145 B.R. 784, 788–89 (S.D.N.Y. 1992), aff'd sub nom. *Wingspread Co. v. Paramount Comm.*, 992 F.2d 319 (2d Cir. 1993).

[64] 73 Am.Jur.2d Subrogation § 29 (1974) ("Payment of the debt need not necessarily be made in money to entitle the party making the payment to subrogation. Whatever discharges the liability and is accepted as payment is sufficient.")

debtors and creditors from agreeing on alternate ways to make payments, lest the law

not recognize them and deny the paying party the benefit of its payment.

This is not the case here. ICSP does not point to any signal from or communication

with the United States where the United States indicated to ICSP that it accepted ICSP's

acts as payment prior to the effective date of the Settlement. Even the unauthenticated

letter to Macro Vantage does not show that the United States accepted ICSP's

performances prior to the release of setoff right. Further discovery would not help ICSP

do so. It does not need to take discovery to attest to its own perceptions of actions and to

produce communications it received itself.

ICSP's argument that it had substantially performed its suretyship duties prior to

the Settlement's effective date rests on the NPCC Agreement. The surety argues that this

2014 "binding commitment" to pay for Macro Vantage to complete NPCC "effectively

discharged" the debt prior to the 2016 Settlement.[65] This would be news to the United

States, which asserted a NPCC claim in two separate filings – both made under penalty

of perjury – *after* the NPCC Agreement.

The Government filed two proofs of claim after the August 2014 NPCC

Agreement. One in October of that year and the second, an amendment, in May 2016.

Both asserted a $24,320,207.42 contingent claim on the NPCC project; a claim contingent

upon the project's completion pursuant to the NPCC Agreement.[66] The United States

clearly did not think that the NPCC Agreement released it from liability. Quite the

---

[65] D.I. 84, at pp .8, 23-24.

[66] Proof of claim #217-1, at pp. 9, 65 and USPOC #217-2, at pp. 88, 144.

contrary, it used the agreement as a basis for its possible liability! This flies in the face of surety's interpretation.

No reasonable trier of fact could find that ICSP had fully discharged its obligations as surety on the effective date of the Settlement.

**H. The Government's release of setoff rights on the effective date of the Settlement extinguished the possibility of their subrogation.**

The United States' right to offset its own claims is superior to ICSP's right to be subrogated to the United States' setoff rights. Because the Government still had such claims when the Settlement went into effect, ICSP was not subrogated to them. Though the size of the mutuality offsetting claims the United States had when it released its setoff rights depends upon which Debtor is entitled to the Tax Refund, whatever setoff rights the United States retained, it released through the Settlement. Because ICSP's claim to offset its spending derives solely from the Government's setoff rights, this release eliminated ICSP's potential ability to setoff its spending.

## CONCLUSION

First lien creditor BMO is entitled to whatever portion of the Tax Refund the United States relinquished. The balance of the Tax Refund also goes to BMO as the first lien creditor.

The Court will grant summary judgment to BMO. It will deny ICSP's motion. An Order will be entered.